## Commonwealth ex rel. Gribbel v. Fehr et ux.

*Samuel L. Sagendorph,* for relator.

*Joseph K. Fornance,* for respondents.

KNIGHT, P. J., June 25, 1954.—On April 14, 1954, William G. Gribbel presented his petition to the court on which a writ of habeas corpus was awarded, commanding Harry W. Fehr and Lillian N. Fehr to pro-

duce Catherine Fehr Gribbel before the court and there to abide the order of the court.

In compliance with the writ, respondents produced the infant relator in court on April 26, 1954, and a full hearing was had at which the following facts were developed.

William G. Gribbel and Elizabeth Fehr were married on July 5, 1943; Catherine Fehr Gribbel was born September 15, 1944, and is now nearly 10 years old. Her parents were divorced May 1, 1951. Both parents have remarried, the father on June 27, 1951, and one child is the result of this second marriage; the mother was remarried February 17, 1952, to Richard Peters, who at the time of the hearing was in the Air Force, stationed somewhere in the Near East.

Since the divorce of the parents in 1951, the child, Katy, has lived most of the time with her grandparents, the named respondents. All of the parties are people of culture, refinement and wealth, and the homes of both the father and grandparents are suitable as a home for Katy. The child is supported by the income from a trust fund created by the father at the time of his divorce from the mother.

The first question to engage our attention is whether Mr. and Mrs. Fehr are the proper respondents in this case. True, Katy has lived in their home most of the time from 1951, but so has her mother until her marriage to Mr. Peters in 1952. Since her marriage to Mr. Peters, the mother has lived where her husband was stationed, but she has spent half of her time with Katy in the home of her parents in Whitemarsh Township; this was thought best for Katy because of her school and the unsettled life of service people. The mother has had custody of Katy ever since the divorce; it is she that directs the course of the child's life, it is she who makes the decisions as to where Katy shall live and with whom, she has never abandoned her child or released her custody of her. When her husband is

discharged from the service, they intend to establish a home of their own and take Katy to live with them. We could perhaps dismiss this writ at this point, for Katy is in the custody and control of her mother and not under the control of respondents. In order to save time, however, we will treat the case as if Elizabeth Fehr Peters had been named as respondent.

The father asks for permanent custody of Katy. This would not be for the best interest and permanent welfare of the child at this time. She has only seen her father two or three times since 1950 and he is almost a stranger to her. She is well adjusted, very adequately maintained and surrounded by affection and loving care. To tear this little life up by the roots and attempt to transplant it now would be nothing less than cruel. This father must become better acquainted with his child before he should ask for even limited custody.

On the other hand, it would certainly not be to Katy's permanent welfare to become completely estranged from her father and her father's family.

We are therefore going to make an order which will give the father an opportunity to know his child and win her affection; it will also give Katy an opportunity to know her father better and to meet her father's wife, who appeared to us to be a sensible and understanding woman. If this works out well, the father may then request longer periods of custody.

It is true that the father has not been refused permission to see his child in the home of her grandparents but there seems to be some feeling between the father and the grandparents and we believe it would be better for all concerned if the father could see Katy at some neutral place. The home of any one of the father's sisters, particularly the home of Mrs. Elkins, we think, would be a suitable place for the father to see his child.

The evidence discloses that Katy spends the summer months at Rehobeth and this order shall not be effective while Katy is at Rehobeth. We believe, however, that

some arrangement should be agreed upon by the mother and father whereby the latter may see his child during the vacation months. If the parties cannot agree upon this or upon a neutral place for the visitations, the court, upon application of either party will arrange the details.

And now, June 25, 1954, the infant relator, Catherine Fehr Gribbel, is remanded to the custody of her mother, Elizabeth Fehr Peters. The father of the child, William G. Gribbel, shall have temporary custody of the child every other Sunday from 2 p.m. to 6 p.m. at the home of some third person to be agreed upon by the mother and father. The father shall go for Katy and return her to the home of her mother or grandparents, whichever home she may be living in at the time. This order is suspended during the time Katy is in Rehobeth during the summer months. In addition, the father shall have custody of the child on alternate holidays at his own home between the hours of 1 p.m. and 6 p.m., beginning with Thanksgiving Day, 1954. The mother and father may, by mutual agreement, vary the schedules set forth in this order.

The father, William G. Gribbel, is to pay the costs of this proceeding.